# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

|  |  |
|---|---|
| MONTY BLATT, Individually and on Behalf of All Others Similarly Situated<br><br>Plaintiff,<br><br>v.<br><br>CORN PRODUCTS INTERNATIONAL, INC., and SAMUEL C. SCOTT, III,<br><br>Defendants. | No. 05 C 3033<br>Judge James B. Zagel |

## MEMORANDUM OPINION AND ORDER

This is a securities fraud class action. Defendants Corn Products International, Inc. ("Corn Products") and Samuel C. Scott ("Scott") seek dismissal of the complaint for failure to meet the heightened pleading requirements that apply in such cases. *See Makor Issues & Rights, Ltd. v. Tellabs, Inc.* 437 F.3d 588 (7th Cir. 2006). For the purpose of this motion, the facts are not complicated and the claims are not based on arcane principles of corporate governance or accounting.

Corn Products refines corn (by grinding and milling it) into various products, such as high-fructose corn syrup, corn syrup and dextrose, which it sells to companies for use in the manufacture of products including candy, chewing gum, soft drinks and other foods. Corn is the largest raw material cost. Other significant costs include energy to run the mills, storage and shipping. Corn Products hedges against the risk of upward fluctuations in the cost of corn so its future costs are known well in advance. It also knows in advance the price it will get for high-fructose corn syrup (one of its principal sweetener products) because in the first quarter of each

year it usually negotiates the price its United States customers will pay for the year ahead. Canadian customers negotiate prices earlier in the fall.

Almost all high-fructose corn syrup is made in this country by four large companies in the Midwest; their products are essentially fungible. All of the companies in this business make a substantial capital investment in refining equipment. Law prohibits the producers from agreeing amongst themselves to set a minimum price, so competition is stiff. Presumably the lowest-cost producer offers the best price and the other producers have to meet it and live with their higher costs (and lower profit margins).

The fall 2004 hedging against the cost of corn did not work well for Corn Products in 2005. Corn prices had fallen by the time the U.S. prices were to be set and customers wanted prices that reflected the price of corn at the time of the negotiations. Other things went wrong as well. The company had produced a large amount of product in the last quarter of 2004 and had to pay to store the large amount of excess product. There were also manufacturing failures at its largest U.S. plant in January 2005. All of these circumstances were considerably worse for Corn Products during the early months of 2005 than they had been in prior, comparable periods.

Defendants do not challenge the basis of these assertions.[1] Nor do they appear to challenge the proposition that the highest level of management knew of these problems. The

---

[1] Plaintiffs rely, in part, on confidential sources, whom they describe with sufficient specificity. The sources are employees, most of whom worked at Corn Products during part or all of the class period. They include managers at the Argo facility, a corporate accountant, an employee who worked in hedging and an administrative assistant. These employees claim knowledge of the operating problems alleged in the complaint and particularly the losses during one month. Defendants argue that these sources cannot draw conclusions about the overall earnings for the entire year 2005, which is true; but they have knowledge of facts which could support an inference that the problems encountered during the class period would have adverse effects on the full year performance in 2005.

2

challenge to the complaint is based, mostly, upon contentions that Corn Products' statements to the market about its financial status are not actionable under the securities law. Corn Products argues that the alleged fraudulent assertions are not misleading because the statements: (1) were directed to the projected performance for the entire 2005 year, while the problems were only first quarter 2005 problems; (2) constituted mere puffing; and (3) were forward-looking statements protected by a safe harbor in the law. Defendants also argue that the allegations of loss causation are inadequate.

Cases like these turn on what the company told the public. On January 25, 2005, Corn Products issued a press release saying: "Corn Products International expects to see continued improvement over its 2004 performance . . . ." In the conference call with analysts that usually follows such releases the company said:

> We are again not in a position to advise a quantified outlook for 2005. However, we can provide some directional comments about what we expect will be another solid year of EPS growth. In North America, we look forward to another improving year . . . . Clearly, we have higher energy costs to contend with on the cost side . . . we [are] not ready yet to quantify 2005. We expect after a very good 2004, to deliver an even-better 2005.

It Corn Products' practice to prepare "monthly books" for its executives, including the CEO (a defendant here) and the CFO. These reports contained financial results and other information that company officers discussed during a meeting the second week of each month. After the February officers' meeting the company released another statement. This February 22, 2005 press release said:

> [Corn Products] today stated that it has substantially completed contracting for its U.S. business. The Company expects that its U.S. sweetener prices will increase in the low-single-digit range in

3

>2005. We believe that the price increase will be sufficient to offset
>higher energy costs in the U.S. business. As a result, the Company
>expects its U.S. business to see improving operating margins in
>2005 and to have another year of improvement on its return on
>capital.

The company had a policy of not offering quarterly guidance to the public or the analysts, so this statement included no predictions about the first quarter of 2005. The statement did not refer to the bad hedge on corn prices, the manufacturing problems or the unusually high freight and storage costs.

On April 5, 2005, Corn Products issued another, much darker, press release. It said:

> [Corn Products] expects first-quarter diluted earnings per share
> (EPS) to decline 35 percent to 40 percent from the first quarter of
> 2004, due primarily to a combination of three factors that affected
> the US and Canadian portions of its North America region:
>   –Net corn costs for the quarter were significantly
>   higher than last year's first quarter, driven by lower
>   co-product values and the timing of corn purchases
>   for contracted business;
>   –Energy and freight costs were higher compared to
>   the first quarter of 2004; and
>   –Manufacturing expense problems during the first
>   quarter.

The release noted that the first quarter of 2004 had the lowest corn costs of any quarter in 2004 and explained that "in addition to the expected increase in net corn costs and energy costs, the unanticipated manufacturing and freight expense issues contributed to results that were lower than our expectations." Corn Products' financial statements appear to establish that the profitability of each quarter varies from year to year. In any event, the price of the shares fell from $25.86 on April 4, 2005 to $20.98 at the close of April 5, 2005.[2]

---

[2]An informal rule sometimes used for evaluating the potential worth of cases like this (from the perspective of plaintiffs' counsel) is that the one-day price drop should be about 25-

The analysts were unhappy. Prudential Equity Group, LLC asked two questions in unfriendly tones. First, "how much of these March 2005 difficulties were known when [Corn Products] issued [the] February 22 release?" Second, it noted that corn had been purchased before further drops had been seen and asked "why brag about higher sweetener prices when it has higher costs?" Salomon Smith Barney reported that "it was only a month ago, when [Corn Products] issued a press release indicating that pricing increases . . . would likely be sufficient to offset higher energy costs." Deutsche Bank sounded the harshest note when it reported: "[w]e believe that as of February 22nd, Corn Products was very much aware of its net corn costs and its energy costs and still was projecting growth in the US business . . . ."

The company announced its first quarter results just after the close of the putative class period, which would run from January 25, 2005 through April 4, 2005. A press release issued on April 19, 2005 reported that EPS was down to 22¢, compared to 35¢ in the same quarter of 2004. Operating income also fell from $24 million to $3 million. The analysts' call that followed this press release was predictably difficult for the company's executives. The theme voiced repeatedly by the analysts was that some of Corn Products' first quarter problems were not anticipated but some were. The unpredictable problems were "freakish power problems at several plants" which "reduced . . . production rates . . . and increased spending to recover from them." As Defendant and CEO Scott said, "when plants of our size go down in the winter, the cost of unfreezing and debottlenecking the problems that exist are major."

---

30% for a truly promising case. This may explain why Plaintiffs specifically note that there was a 30% price drop from the high in the class period to the proposed close of the period on April 5.

On the other hand, the Prudential Equity Group analyst challenged Scott on one of the very points at issue in this case when he said, "I just don't understand what happened between the timing of [the February 22nd] release, and six weeks later, the timing of the early April press release. You sought to combat any negative sentiment in your stock by stating that your U.S. margins would be up . . . . What happened after that [earlier] press release and why did you feel so compelled to issue that press release?" In response, Scott offered his explanation but stated in the middle that "we knew beforehand our goals and our numbers reflected that our quarter would not be as strong as first quarter last year." The Smith Barney analyst asked a follow up question based on the obvious fact that the company knew its corn costs were high: "if you knew this the whole time, why wouldn't you just give us a little bit of guidance . . . that the first-quarter numbers were going to be such [a] difficult comparison?" Scott responded that the company practice was to give guidance at the end of the first quarter.

***Defendants' Motion to Dismiss***

Defendants begin with the argument that the January and February statements are not alleged to be false or misleading because the statements addressed the full year results for 2005 and not the first quarter of 2005. Defendants contend that this is particularly clear from the context of the January release, which spoke mostly about the full year results for 2004. I find this argument difficult to understand. The full year 2005 includes the first quarter 2005. Assuming, as I must, that Defendants knowingly withheld information showing that the first quarter 2005 was going to be a disaster, it might be proved, *see Conley v. Gibson*, 341 U.S. 41 (1957), that the statements were false and misleading about the full year 2005. It is reasonable to infer from the

6

facts alleged that the first quarter 2005 was not merely an ordinary shortfall[3] but a near complete disaster. If the company's statements are neither puffing, nor protected by the safe harbor in the statute, then Plaintiffs *could* prevail.

There may be good defenses to Plaintiffs' claims. The company might have had a justifiable belief in the full year 2005 projections based on past disasters of a similar nature (and timing). This is a matter for the merits of the case, however; it fails as a ground for dismissal. The company also asserts that all it said (in January and February) was that it was "looking to 2005 and expecting improvement" and that Plaintiffs do not and cannot say this was false or misleading. I think Plaintiffs do say this well enough. The clear inference from the complaint's allegations is that no reasonable executive could, at the time of the statement, honestly have expected improvement in 2005. The specifics of the catastrophe of the first quarter of 2005 and Defendants' knowledge of them are adequately alleged under the PSLRA. If the statements are not otherwise protected by law, then Plaintiffs are entitled to have an answer to their claims.

Defendants next argue that the statements are "puffing," which is the label the law applies to statements so general or vague that they could not possibly influence the market price of a share. *See Eisenstadt v. Centel Corp.*, 113 F.3d 738, 746 (7th Cir. 1997) ("[m]ere sales puffery is not actionable under Rule 10b-5") (citations omitted); *Raab v. General Physics Corp.*, 4 F.3d

---

[3]I do not find fault with Defendants' general theory that disappointing monthly or first-quarter results are not sufficient to claim that a full year prognosis is false or misleading. However, this case, as pleaded, shows something far more than disappointing quarterly results. Plaintiffs allege is a catastrophic shortfall for one quarter of the year in question. Whether, in context, this shortfall was catastrophic by the standards of the industry or Corn Products' history remains to be seen. I do not doubt that it is difficult to delineate what constitutes such an extraordinary quarterly shortfall that it rightfully calls into question the projections for the whole year, but it seems to me that any standard would include the quarter at issue in this case.

286, 289-90 (4th Cir. 1993). Statements such as "we expect continued improvement" or "look forward to a better year" are often considered puffing. *See, e.g., Raab,* 4 F.3d at 289 (predictions of future growth found in defendant's annual report, such as "[r]egulatory changes . . . have created a marketplace for the [company] with an expected annual growth rate of 10% to 30% over the next few years," and "[the company] is poised to carry the growth and success of 1991 well into the future" were puffing statements and not material); *San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos.*, 75 F.3d 801, 811 (2d Cir. 1996) ("general announcements by [defendant] that it was 'optimistic' about its earnings and 'expected' [the product] to perform well" did not trigger a duty to disclose an alternative marketing strategy). *See also Eisenstadt*, 113 F.3d at 746-7 (in case involving the sale of a company, a non-specific representation that sale efforts were going well was not material).

I do not think that puffing occurred here. Corn Products' statements were not general statements of corporate optimism. Rather, they included a measurable prediction of the results to be achieved, specifically "improvement over the 2004 performance" and a prediction that the company will achieve "improving operating margins and a [higher rate] of return on its capital." *Cf. Tellabs*, 437 F.3d at 597 (the positive statement "we're still seeing that product continue to *maintain its growth rate*," offered in response to a specific investor question about a possible sales decline, was not mere puffery). Defendants statements were also made in the context of discussing specific factors that might affect profits and operating margins, such as higher energy costs and price increases in the low, single-digit range.[4] This context tends to show that

---

[4]*Cf. San Leandro Emergency Med. Group*, 75 F.3d at 810-12 (dismissing plaintiff's claim, which was based on defendant's failure to disclose an alternative marketing strategy); *and Raab*, 4 F.3d at 289 (annual report's failure to disclose a contracting slowdown not actionable

Defendants' statements were not simple expressions of optimism but reasoned predictions of the future. I will not dismiss the Complaint on the ground that the alleged statements were mere puffing.[5]

Defendants also claim that the statements at issue are forward-looking and protected by the safe harbor of the Private Securities Litigation Reform Act ("PSLRA"). This is their easiest argument to make because it is indisputable that the statements are forward-looking. Forward-looking statements are not actionable as long as at least one other condition is met. The statements must be "accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those identified in the forward-

---

when its predictions about the next year were too vague to be material, and when a contemporaneous press release "informed the market" of the slowdown).

[5]Judge Wilkerson's 1993 *Raab* opinion provides perhaps the strongest support for dismissal of the claims. 4 F.3d 286. That case involved an annual report that failed to disclose a major blow (a contacting slowdown) to the firm's revenue. *Id*. at 289. The Court held that the failure to disclose was not actionable because there was a contemporaneous disclosure of the slowdown. *Id*. However, the opinion also noted that the annual report addressed the previous year's results and not the subsequent year's prospects; as such, predictions within the report were not material misstatements but puffery. *Id*. The predictions included estimates of a growth rate of 10-30% over the next few years and an expectation that the defendant would carry the "growth and success" of the previous year into the future. *Id*. Nevertheless, the more recent *Tellabs* decision in this Circuit suggests that puffery is limited to vague statements of optimism, such as "we feel very, very good about [our] robust growth" and "demand for our . . . products remains strong." 437 F.3d at 597. *Tellabs* places executives' optimistic but specific predictions–made in response to analysts' questions or in statements published in a "frequently asked questions" section of an annual report–into the realm of non-puffery. *Id*. at 597-98.

9

looking statement" or the forward-looking statement must be "immaterial".[6] 15 U.S.C. § 78u-5 (c)(1) (A) & (B).

The use of the word "meaningful" is Delphic. One could interpret this to mean that the cautionary statements must be more than the customary boilerplate found in all filings of public companies. *See, e.g., Asher v. Baxter Int'l Inc.*, 377 F.3d 727, 732 (7th Cir. 2004) (in case involving safe harbor provision, "'boilerplate' warnings won't do; cautions must be tailored to the risks that accompany the particular projections"). But boilerplate language is "meaningful" in the sense that without it, the filings would be defective. The boilerplate language is required by law and it has become boilerplate because we are so used to seeing it. One of the unfortunate side effects of mandated disclosure is the increasing familiarity of these disclosures; and what is routine is often ignored. Having heard several IPO-based cases in the later decades of the 20th century, I sometimes thought that an IPO that explicitly disclosed the criminal intent of those offering the security would still find buyers in the market.

---

[6]There is a third condition which protects a speaker of bad predictions from liability: the failure of the plaintiff to prove actual knowledge that the statement was false or misleading. *See* 15 U.S.C. § 78u-5(c)(1) ("a person referred to in subsection (a) shall not be liable with respect to any forward-looking statement, whether written or oral, if and to the extent that – . . . (B) the plaintiff fails to prove that the forward-looking statement– (i) if made by a natural person, was made with actual knowledge by that person that the statement was false or misleading; or (ii) if made by a business entity; was– (I) made by or with the approval of an executive officer of that entity; and (II) made or approved by such officer with actual knowledge by that officer that the statement was false or misleading"). The very language of this exception teaches that this is a matter for trial or summary judgment and not a motion to dismiss since it is directed to failure of proof. Although Defendants argue that actual knowledge is not alleged, their argument is based a theory that I have already rejected: that knowledge that the first quarter was bad could not under any circumstances constitute knowledge that the whole year would be worse. That Defendants knew that the first quarter would be worse than anticipated is adequately alleged. I will not dismiss the complaint for failure to adequately allege the actual knowledge required by the statute.

On the other hand, conventional securities regulation statutes that mandate disclosure do not use the word "meaningful," so Congress may have intended to require more than "material" disclosures in order to exempt a defendant from liability for statements that, in hindsight, turn out to be wrong. *Asher* suggests that boilerplate statements will rarely be sufficient, *id*. at 732, and argues that cautions are "meaningful" when, for example, they "point to the principal contingencies that could cause actual results to depart from the projection," *id*. at 734.

It is partly to avoid this uncertainty that Defendants do not ask me to decide whether their statements were sufficiently cautionary, although they state in a footnote that there were adequate cautions given. Moreover, Defendants probably believe, as I do, that whether the cautions at issue here were adequate is a not question to be answered on a motion to dismiss. *See id*. at 734. The sufficiency of Defendants' cautionary tone (if, indeed, one was required) is a question of fact, or possibly a question of law, that can be answered only on a more developed record.

Finally, Defendants allege that Plaintiffs did not adequately allege causation. Federal law requires Plaintiffs to allege how it is that the claimed misrepresentations caused their loss. *See Dura Pharms., Inc. v. Broudo*, 544 U.S. 336 (2005). In simple terms, Plaintiffs must state facts from which one could reasonably conclude that the stock price decline was caused by the "corrective disclosure" rather than some other cause, such as an explosion destroying the company plant.

Defendants again argue, unconvincingly in the context of a motion to dismiss, that there was no corrective disclosure on April 5 because the January 25 and February 22 statements did not make any representations about the full 2005 year results nor offer assurance about the problems specifically disclosed in the April 5 report. I again reject the premise on which this reasoning is based. Under the conditions alleged here, the earlier statements did make

representations by omission to the public about the 2005 year.  Further, with respect to loss causation, Plaintiffs allege that Defendants made a public report effectively correcting the earlier reports and the share price dropped 19% in one heavy trading day immediately thereafter.[7]

Having decided that the complaint is adequate in its allegations against Corn Products, I decline to dismiss the claims against the Defendant Scott who is properly alleged to be a person in control of the company under Section 20(a) of the Exchange Act.  15 U.S.C. § 78t(a).[8]

The motion to dismiss the complaint is denied.

                              ENTER:

*James B. Zagel*

                              James B. Zagel
                              United States District Judge

DATE: June 14, 2006

---

[7] It is uncontradicted that the January and February statements were themselves followed by small percentage declines in the share price, but a wrongful misrepresentation that serves to limit share price loss is just as illegal as one that serves to raise the share price.  A reasonable trier of the facts could conclude that the earlier statements were made by a management desperate to offset what they perceived to be looming pessimism of the market toward their company.  Whether this is true will have to decided some other day.

[8] I reserve for later briefing questions of standing of the individual Plaintiffs, an issue raised only in footnotes of the briefs.